**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benjamin Anthony Altamirano, Jr., | No. CV-15-00169-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| County of Pima, et al., | |
| Defendants. | |

Pending before the Court are Defendant Pima County's Motion for Summary Judgment (Doc. 123), Defendant City of Tucson's Motion for Summary Judgment (Doc. 125), and Plaintiff's Motions to Strike (Doc. 144, 145). The Court will deny Defendant Pima County's summary judgment motion, and grant in part and deny in part Defendant City of Tucson's summary judgment motion; the motions to strike will be granted in part.

## I. Background

This action arises out of Plaintiff's arrest and year-long confinement on suspicion that he had participated in a home invasion. Plaintiff alleges that he was arrested and prosecuted without probable cause. (Doc. 26 at 5, 9.) He further alleges that he was a victim of Defendant Pima County's ("the County") and the Defendant City of Tucson's ("the City") unconstitutional policies relating to arrests, interrogations, and the decision to seek indictments. (*Id.* at 2, 11.) Finally, he alleges that Defendants conspired to bring about these deprivations of his rights. (*Id.* at 9-11.)

Plaintiff filed suit in the Pima County Superior Court on April 1, 2015; the County filed a Notice of Removal to Federal Court on April 22, 2015. (*See* Doc. 1.) The County

then filed a motion to dismiss (Doc. 18), which the Court granted in part and denied in part. (Doc. 25.) The Court found that the County failed to show, as a matter of law, that the deputy county attorney was not a municipal policymaker. (Doc. 25 at 4.) Further, because the Court found that Plaintiff had sufficiently alleged a final-policymaker theory of liability, it declined to address whether Plaintiff had failed to adequately plead a deliberate indifference theory of liability. (Doc. 25 at 5, n.2.) The Court dismissed with prejudice Plaintiff's intentional and negligent infliction of emotional distress claims with respect to the County on the ground that "under Arizona law, [the] County cannot be held vicariously liable for any torts committed by the county attorney while engaged" in "[i]nitiating a criminal prosecution, convening a grand jury, and continuing to pursue the prosecution[.]" (Doc. 25 at 7.) The Court dismissed with leave to amend Plaintiff's malicious prosecution and conspiracy claims. (Doc. 25 at 5-6.)

On March 7, 2017, Plaintiff timely filed a Second Amended Complaint (Doc. 26), which brings the following three counts against both Defendants under 42 U.S.C. § 1983: (1) False Arrest and Imprisonment, (2) Malicious Prosecution, and (3) Conspiracy. Plaintiff seeks compensatory damages, costs, and attorneys' fees. (Doc. 26 at 15.) No motion to dismiss was filed as to the Second Amended Complaint, and the Parties proceeded with discovery. Discovery closed on May 30, 2018 (*see* Doc. 113), and each Defendant filed a Motion for Summary Judgment (Doc. 123, 125). Defendants filed Replies in support of their respective summary judgment motions (Doc. 140, 141), which are the subject of Plaintiff's instant Motions to Strike (Doc. 144, 145).

## II.     Motions to Strike

In the Motions to Strike (Doc. 144, 145), Plaintiff asks the Court to strike both Defendants' Replies and Reply Statements of Facts (Docs. 139-142) on the ground that they do not comply with the Local Rules of Civil Procedure. Both Defendants respond that their Replies do comply with the Local Rules and ask that, at most, only their Objections to Plaintiff's Statement of Facts (Doc. 139, 142) be stricken.

The Local Rules do not permit filing reply statements of facts. LRCiv 56.1(b).

Local Rule 7.2 allows a party to move to strike "any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." LRCiv 7.2(m). A motion to strike, however, "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 759 F. Supp. 1335, 1339 (N.D. Cal. 1991); *see also Yount v. Regent Univ., Inc.*, No. CV-08-8011-PCT-DGC, 2009 WL 995596, at *11 (D. Ariz. Apr. 14, 2009) ("[E]ven a properly made motion to strike is a drastic remedy which is disfavored by the courts and infrequently granted." (internal quotations omitted)).

The Local Rules permit replies, LRCiv 56.1(d), but do not allow for a "reply statement of facts[,]" LRCiv 56.1(b). The Objections to Plaintiff's Statement of Facts are in essence reply statements of facts. The Court will deny the Motions to Strike as to Defendants' Replies, which are permissible under the Local Rules, and grant the Motions to Strike as to the Objections, which are not permissible. The Court will not consider the Objections in resolving the summary judgment motions.

## III.    Facts

Making all reasonable inferences in Plaintiff's favor, the Court finds the facts are as follows:

Plaintiff was arrested by Tucson Police Department ("TPD") officers on April 29, 2010 on suspicion of having participated in a home invasion that involved a sexual assault. (Doc. 124 ¶ 1; Doc. 126 ¶ 1.) TPD conducted an investigation into the home invasion, led by TPD Detective VanNorman. (Doc. 124 ¶¶ 1-2.) As part of the investigation, Plaintiff was interrogated by VanNorman and fellow TPD Detective Robinson. (Doc. 126 ¶ 2.) At the time of his interrogation, Plaintiff was fourteen years old. (*See* Doc. 126-1 at 2.)

Although he initially denied involvement, Plaintiff's interrogation resulted in his confession to participating in a home invasion which involved sexual assault of a minor victim. (*See* Doc. 126-2.) Plaintiff was read his *Miranda* rights at the beginning of the

interrogation (*see* Doc. 126-2 at 8) and eventually requested the presence of a lawyer. (Doc. 126-2 at 42.) Despite requesting a lawyer, Plaintiff continued to speak with interrogators, who then re-administered the *Miranda* warnings. (Doc. 126-2 at 54.) At one point in the interrogation, Plaintiff struggled with giving interrogators information they were requesting regarding the type of weapon used in the home invasion; he volunteered that he is "kind of retarded." (Doc. 126-2 at 132.) He further explained that he is in "special education, [has a] learning disability[,]" and that he is doing "[n]ot that good in school" because he's "special." (Doc. 126-2 at 132-33.) Interrogators continued to question Plaintiff for more than an hour, without a parent or lawyer present, about the details of the home invasion and Plaintiff's supposed involvement. (*See* Doc. 126-2.)

Following Plaintiff's interrogation, VanNorman scheduled an appointment with a Pima County Attorney's Office ("PCAO") prosecutor, seeking to bring criminal charges against Plaintiff. (Doc. 124 ¶¶ 2-4; Doc. 126 ¶ 2.) VanNorman had two meetings with PCAO prosecutors, first with Deputy County Attorney Spivack, and later with Deputy County Attorney Delany. (Doc. 124 at ¶¶ 4, 6.) Delany scheduled the case before a grand jury on June 1, 2010, and did not speak with VanNorman again before presenting the case to the grand jury. (Doc. 124 ¶¶ 10, 12-13.) VanNorman provided testimony before the grand jury regarding the robbery and sexual assault. (Doc. 124 ¶ 14.) Delany knew that she was required to present any exculpatory evidence to the grand jury; the only evidence she presented to the grand jury was VanNorman's testimony. (Doc. 124 ¶ 15, 34; Doc. 134 ¶ 34.) With regard to Plaintiff, VanNorman testified that police tracked a cellphone taken during the robbery to Plaintiff's home address, although Plaintiff was at school when the cellphone was tracked to his family's home. (Doc. 124 ¶ 14.) VanNorman additionally testified that Plaintiff admitted to committing the robbery with three other suspects; that he named those other suspects, singling out the suspect who committed the sexual assault; and that his "account of the robbery identified specific details of the event." (*Id.*) Based on VanNorman's testimony, and only VanNorman's testimony, Plaintiff was indicted on criminal charges. (Doc. 124 ¶¶ 15, 16.)

A transcript of Plaintiff's interrogation was prepared January 12, 2011, approximately two months before Delany left the PCAO. (Doc. 124 ¶¶ 18, 20.) Deputy County Attorney Otto, who was assigned to the case after Delany left the PCAO, reviewed the interrogation transcript in detail and later discussed it with Plaintiff's criminal attorney. (Doc. 124 ¶¶ 21, 23; Doc. 126 ¶ 5.) Based on her review, Otto concluded that Plaintiff's admissions during the interrogation were all facts TPD interrogators had brought up earlier in the interrogation; accordingly, she concluded there was insufficient evidence to proceed with the case. (Doc. 124 ¶¶ 23, 24; Doc. 126 ¶ 5.) On April 26, 2011, Otto moved to dismiss the indictment against Plaintiff without prejudice; the trial court granted her motion and dismissed the charges on May 2, 2011. (Doc. 124 ¶ 25-26.)

Neither the City nor TPD have a written or published policy to present false testimony to a grand jury and/or to seek an indictment based on such false testimony. (Doc. 126 ¶ 17; Doc. 134 ¶ 17.) There is also no evidence of a written or published policy that impliedly authorizes presentation of false testimony to a grand jury or to seek an indictment based on the false testimony. (Doc. 126 ¶ 20; Doc. 134 ¶ 20.) At the time of Plaintiff's interrogation, TPD General Order 21.24.2 provided that during juvenile interviews and interrogations "[a] member may confer with a juvenile's parents during an interview. If a parent is present and insistent on being present during the interview, they shall be permitted." (Doc. 126 ¶ 23.) A separate TPD General Order in effect at the time read: "Officers will take into consideration the age and psychological state of the juvenile when conducting the interview." (Doc. 126 ¶ 29; Doc. 134 ¶ 29.)

## IV.    Summary Judgment Standard

Summary judgment should be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence would enable a reasonable trier of fact to resolve the dispute in

favor of the nonmoving party. *See id.* At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In evaluating a motion for summary judgment, the Court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). If the "evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.*

The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). If, after considering the arguments and materials in the record, it appears that reasonable jurors could find that the defendant is liable, then the court should not grant summary judgment. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027-28 (9th Cir. 2006). If, however, jurors of reason could not determine that the plaintiff is entitled to a judgment in her favor, then summary judgment is appropriate. *Id.*

## V.     The County's Motion for Summary Judgment

The County brings three grounds upon which it argues it is entitled to summary judgment: (1) there is no factual or legal basis for Plaintiff's final-policymaker theory of liability because the deputy county attorneys are not final policymakers for the County but rather act on behalf of the State and are entitled to Eleventh Amendment Sovereign Immunity, (2) the failure-to-train claim of liability is barred by Eleventh Amendment Sovereign Immunity because "prosecutorial-training decisions constitute state action[,]" and (3) alternatively, all three counts fail on the merits. (Doc. 123 at 2.) The Court will deny the Motion.

### A.     Eleventh Amendment Immunity

The County argues that all of Plaintiff's claims must fail because the deputy county attorneys, and PCAO in making prosecutorial training decisions, were state actors. "[O]nly States and arms of the State possess immunity from suits authorized by federal law[,]" *Northern Ins. Co. of New York v. Chatham County, Ga.*, 547 U.S. 189, 193

(2006), and "the public entity [claiming immunity] ought to bear the burden of proving the facts that establish its immunity under the Eleventh Amendment[,]" *ITSI T.V. Prods., Inc. v. Agricultural Assocs.*, 3 F.3d 1289, 1292 (9th Cir. 1993). *See also*, *Pennhurst St. Sch. & Hosp.*, 465 U.S. 89, 100 (1984); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Eason v. Clark Cnty. School Dist.*, 303 F.3d 1137, 1141 (9th Cir. 2002).

A state waives Eleventh Amendment immunity by removing a case to federal court. *See Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 619-24 (2002) (unanimous decision). That is because "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." *Id.* at 624. The waiver applies to both state law and federal law claims, regardless of the motive for removal, and irrespective of any amendments to the complaint made in federal court following removal. *Embury v. King*, 361 F.3d 562, 564-66 (9th Cir. 2004) ("hold[ing] to a straightforward, easy-to-administer rule in accord with *Lapides*: Removal waives Eleventh Amendment immunity"). As the Ninth Circuit put it: "[a]llowing a State to waive immunity to remove a case to federal court, then 'unwaive' it to assert that the federal court could not act, would create a new definition of chutzpah." *Embury*, 361 F.3d at 566.

Because the County removed this case to federal court (*see* Doc. 1), any claim to Eleventh Amendment immunity from suit is foreclosed. The Court will deny the summary judgment motion as to Eleventh Amendment immunity.

## B. Theories of Liability

### 1. *Monell* Final-Policymaker Liability

The County seeks a ruling that all three claims fail as to Plaintiff's *Monell* final-policymaker theory of liability. (Doc. 123 at 6.) Specifically, the County argues that Plaintiff's claim that a conspiracy between Deputy County Attorneys Delaney and Lauritzen and Detective VanNorman constituted County policy is incorrect because prosecutorial decision-making is entirely delegated to the PCAO and goes unreviewed by

the Pima County Board of Supervisors. (*Id.* at 5.) Rather, the County argues, the deputy county attorneys are *state actors* when they conduct criminal prosecutions, and thus they cannot be held liable. (Doc. 123 at 9-10.)

"To hold a local government liable for an official's conduct [under § 1983], a plaintiff must first establish that the official (1) had final policymaking authority concerning the action alleged to have caused the particular constitutional or statutory violation at issue and (2) was the policymaker for the local governing body for the purposes of the particular act." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (internal quotations omitted).

As to Delany, the County argues that even if the *elected* county attorney could be considered a final policymaker, Delany was not. (Doc. 123 at 13.) Delany, the County argues, decided "unilateral[ly]" to present Plaintiff's case to the grand jury and that, as a result, "there is no factual basis for tying Delany's conduct to an act of Pima County." (*Id.*) Lauritzen, the County argues, played no role whatsoever in presenting Plaintiff's case to the grand jury. (Doc. 123 at 14.) Thus, it argues there are no facts to support imposing *Monell* liability on the County based on Lauritzen's actions. (*Id.*)

Plaintiff responds in opposition, arguing that Delany had the final decision-making authority to present the case to the grand jury; indeed, he asserts that the County "has presented zero evidence that the State of Arizona or the Arizona Attorney General exercised any authority over the Benjamin Altamirano case" or "over <u>any</u> case prosecuted by the Pima County Attorney ever." (Doc. 133 at 7 (emphasis in original).) In the § 1983 context, the Arizona Supreme Court explained, without deciding, that it cannot be assumed that "only the [elected] county attorney can be the final policymaker in the County attorney's office." *City of Phoenix v. Yarnell*, 909 P.2d 377, 387 (Ariz. 1995) ("The county attorney surely does not personally make decisions in each case being prosecuted.").

The Court cannot find as a matter of law that Deputy County Attorneys Delany and Lauritzen did not have final policymaking authority in their role as prosecutors. The

Arizona Supreme Court explains that "[t]he prosecutor makes the determination whether to file criminal charges and which charges to file." *See State v. Murphy*, 555 P.2d 1110, 1112 (Ariz. 1976) (en banc). *Murphy* arose out of a capital case, where the prosecutor sought a life sentence instead of the death penalty, but the trial court obliged the prosecutor to present aggravating circumstances, which led to imposition of the death penalty. *Id. Murphy* and its progeny established in Arizona that except when a county attorney is "acting illegally or in excess of his or her powers[,]" prosecutors have almost *absolute* discretion in Arizona courts. *See e.g., State v. Peltz*, 391 P.3d 1215, 1219 (Ariz. Ct. App. Div. 2 2017).

Although the County asserts that "[t]he Pima County Attorney never delegated policymaking authority for Pima County" it also states that "Delany made the unilateral decision to present [Plaintiff's] case to a Grand Jury" without concurrently, albeit incongruously, arguing that Delany did not have authority to take that action. (Doc. 123 at 13; Doc. 135-1 at 24 (stating in a deposition that she has never consulted the Board of Supervisors before presenting a case).) If Delany, within her authority as a deputy county attorney, made the "unilateral decision" to present the case to a grand jury, then she was the final decision-maker on that issue. As a result, there is sufficient evidence to find that the deputy county attorneys were final policymakers and summary judgment must be denied on this issue.

All of the County's arguments in its summary judgment motion regarding deputy county attorneys Delany and Lauritzen's final policymaker liability are premised on the attorneys being state actors. (*See* Doc. 123 at 13.) Having found that the Eleventh Amendment does not shield the County from suit, the issue of whether the deputy county attorneys were working on behalf of the State or the County is relevant to the extent that *Monell* liability requires the existence of a municipal policy. *See Weiner*, 210 F.3d at 1028 ("To hold a local government liable for an official's conduct [under § 1983], a plaintiff must first establish that the official . . . was the policymaker *for the local governing body* for the purposes of the particular act.") (internal quotations omitted)

(emphasis added)). In a recent concurrence, Judge Graber of the Ninth Circuit provided relevant insight regarding the significance of finding that the policy in question was promulgated by a state rather than a municipal actor. *See Taylor v. County of Pima*, 913 F.3d 930, 936 (9th Cir. 2019) (Graber, J., concurring). "Proof that the relevant officials did not work for the municipality defeats the plaintiff's case but by virtue of an ordinary failure to prove an element of a claim . . . . Eleventh Amendment immunity plays no role." *Id.*

The determination of whether an official is acting as a policymaker for the state or for the county "is made on a function-by-function approach by analyzing *under state law* the organizational structure and control over the [relevant official]." *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013) (emphasis added). Factors to consider include (1) the amount of control over the official the government entity possesses, (2) the county's obligation to defend or indemnify the official, (3) the scope of the official's duties, and (4) the official's definition as provided in a state constitution or statute. *Id.* at 755-62. Arizona Revised Statute Section 11-532 governs the powers and duties of county attorneys in Arizona. The statute reads, in relevant part:

> A. The county attorney is the public prosecutor of the county and shall:
>
>> 1. Attend the superior and other courts within the county and conduct, on behalf of the state, all prosecutions for public offenses.
>> 2. Institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses when the county attorney has information that the offenses have been committed.
>> 3. If not engaged in criminal proceedings in the superior court, attend on the magistrates in cases of arrest if required by them, and attend before and give advice to the grand jury.

Ariz. Rev. Stat. § 11-532(A). In the same breath, the statute states that the county attorney is the "public prosecutor of the county" and that it shall "conduct, on behalf of the state, all prosecutions for public offenses." Ariz. Rev. Stat. § 11-532(A)(1).

This Court, without expressly deciding the issue, has previously propounded that "Ninth Circuit precedent supports finding that an Arizona county prosecutor can act as a final *county* policymaker in certain circumstances." *Taylor v. County of Pima*, No. CV-

15-00152-TUC-RM, 2017 WL 6550590, at *10 (D. Ariz. 2017) (emphasis added) (citing *Gobel v. Maricopa County*, 867 F.2d 1201, 1208-09 (9th Cir. 1989) (finding that plaintiffs may be able to prove "that in Arizona the county attorney is the kind of county official whose policy decisions automatically constitute county policy"), *abrogated on other grounds by Merritt v. County of Los Angeles*, 875 F.2d 765 (9th Cir. 1989)), *aff'd in part, dismissed in part by Taylor v. County of Pima*, 913 F.3d 930 (9th Cir. 2019).

An officer may act for the state in one capacity and for the County in another. *Weiner*, 210 F.3d at 1031 ("Although a California district attorney is a state officer when deciding whether to prosecute an individual, this is not to say that district attorneys in California are state officers for all purposes."). To that end, the determination of whether the policymaker acts as a state rather than a county official is necessarily dependent on the challenged acts, *i.e.* it is a fact-specific inquiry. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1041 (9th Cir. 2013); *see also Platt v. Moore*, No. 3:16-CV-08262-BSB, 2018 WL 2058136, at *18 (D. Ariz. 2018) ("To determine whether Moore was a county or state officer, the Court considers his alleged conduct in this action."), *appeal docketed*, No. 19-15732 (9th Cir. April 12, 2019).

The language of the Arizona statute that governs the powers and duties of county attorneys specifies that only conducting prosecutions for public offenses is done *on behalf of the state*. *See* Ariz. Rev. Stat. § 11-532. "Institut[ing] proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses when the county attorney has information that the offenses have been committed[,]" and "attend[ing] before and giv[ing] advice to the grand jury[,]" bear no specific "state actor" designation. *See id.* § A.3. We must presume that the legislature's inclusion of "state actor" in one context but not in others was intentional. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*."). The county attorney is an officer of the county, Ariz. Rev. Stat. § 11-401(A)(5), and each county sets the budget for its respective county

attorney. Ariz. Rev. Stat. § 11-201. Thus, for all purposes other than conducting prosecutions, the statute clearly indicates that the county attorney is an officer of the county. Ariz. Rev. Stat. § 11-532. Indeed, most of Plaintiff's allegations actually fall within subsections 2 and 3 of A.R.S. § 11-532(A), not within subsection 1, which deals with prosecutions conducted on behalf of the State. The Court cannot find, as a matter of law, that the deputy county attorneys were acting in their capacity as state actors at all times relevant to this case.

The Court will deny the County's summary judgment motion as to *Monell* final policymaker liability.

### 2.    *Monell* **Failure-to-Train Liability**

The County argues that the failure-to-train theory must fail as to all counts because "local prosecuting attorneys are state actors when implementing training and policy regarding criminal prosecutions." (Doc. 123 at 14.) Alternatively, the County argues that Plaintiff cannot show deliberate indifference by the elected County Attorney, nor can he "identif[y] a pattern of such violations by the PCAO" or show "that Delany did not know the applicable legal standards." (Doc. 123 at 15.)

Municipal liability under a failure-to-train theory must rise to the level of deliberate indifference in order to be cognizable. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Put differently, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*   *Canton*'s 'deliberate indifference' standard, in which liability is "to be premised on obviousness or constructive notice" is necessarily an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). In addition, "absent evidence of a 'program-wide inadequacy in training,' any shortfall in a single [municipal] officer's training 'can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007) (quoting *Alexander v. City and*

*County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).

The question before the Court with regard to failure-to-train liability is whether the training and policies promulgated by the elected county attorney as to the acts complained of by Plaintiff are on behalf of the state or the county. Other District of Arizona courts have found that when a county attorney implements administrative and supervisory policies it acts on behalf of the county. *See Milke v. City of Phoenix*, No. CV-15-00462-PHX-ROS, 2016 WL 5339693, at *17 (D. Ariz. Jan. 8, 2016) ("Based on the substance of Arizona law, and the similarities between the situation in Arizona and California, the Maricopa County Attorney is a local policymaker when it comes to administrative policies . . . ."); *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 2515950, at *17-18 (D. Ariz. June 18, 2019). Similarly, the Ninth Circuit found in *Goldstein v. City of Long Beach*, that "administrative oversight of systems used to help prosecutors comply with their constitutional duties[,]" are distinguishable from those relating to "prosecutorial strategy" for purposes of making a state versus municipal actor determination. 715 F.3d 750, 762 (9th Cir. 2013). The Court finds that Plaintiff has presented sufficient evidence to create a triable issue as to whether the training and policies promulgated by Pima County with regard to the acts complained of by Plaintiff are on behalf of the state or the county.

Thus, the next issue before the Court must be whether Plaintiff has provided enough evidence of "deliberate indifference" in order to present this theory of liability to a jury. Making all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has presented sufficient evidence to support a showing of deliberate indifference to failure to train. Specifically, Delany's deposition testimony regarding her lack of training as to how to present cases to the grand jury, how to address false confessions and suggestible suspects, and what to review in preparation for presenting a case to the grand jury (*see* Doc. 135-1 at 7-8, 22-23), coupled with Otto's deposition testimony that she has her own method for conducting issuing interviews, and has personally trained others such that "some people now do it more like I do" (*see* Doc. 134-3 at 11-12), is sufficient to

create a triable issue of fact as to whether the County was deliberately indifferent to a failure to train. The Court will deny the summary judgment motion on this issue.

**C.    Merits**

As to each count, the County asserts that Plaintiff's claims fail on the merits. The Court will address each count in turn.

The County argues that Count One, which alleges false arrest and false imprisonment fails because, first, the County played no role in the arrest and therefore cannot be liable for committing these torts, and second, TPD had probable cause to arrest Plaintiff, thus defeating a false arrest or imprisonment claim against even the proper defendant. (Doc. 123 at 15-16.)

As to the false imprisonment claim, Plaintiff responds that the County, who was the final decisionmaker in presenting Plaintiff's case to the grand jury, has "no basis . . . to argue that they had probable cause to secure an indictment and imprison [Plaintiff]." (Doc. 133 at 9.) Citing *In Re Andre M.*, 88 P.3d 552 (Ariz. 2004), Plaintiff asserts that under Arizona law, statements by minor suspects must be considered with caution as they are more likely to be coerced or unreliable. (Doc. 133 at 9.) Further, Plaintiff contests the County's assertion that VanNorman and, later, Delaney did not know of the exculpatory facts in this case. (*Id.* at 10.)

Because the Parties dispute the facts known to the deputy county attorneys, including the manner and sufficiency of the facts communicated by VanNorman to Delany at the time the case was presented to the grand jury, the Court finds that it cannot resolve the question of probable cause at this stage. The issue is more properly left to the jury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008). The County's Motion for Summary Judgment will be denied as to Count One.

The County argues that probable cause, which can be shown through a grand jury indictment, is an absolute defense to a malicious prosecution claim. (Doc. 123 at 16.) Further, to rebut the defense, Plaintiff would have to show that his prosecution was based on some form of wrongful conduct. (Doc. 123 at 16.) The County argues that Plaintiff is

unable to show such wrongful conduct because, "[a]t best, Delany may have been negligent in failing to ferret out the problems with the case . . . ." (*Id.*)

Plaintiff argues that, although the grand jury indictment is prima facie evidence of probable cause, it can be rebutted "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct." (Doc. 133 at 11 (emphasis omitted) (citing *Awabdy v. City of Adelanto*, 368 F.3d 1062 (2004)).) In addition, Plaintiff argues that "[t]he current record contains myriad examples of [] intentionally wrongful conduct." (Doc. 133 at 12.) One example of such wrongful conduct, according to Plaintiff, was Delany and VanNorman presenting "empirically untrue" inculpatory evidence to the grand jury and, later, to the Pima County Superior Court. (Doc. 133 at 13.)

Like in Count One, the Parties dispute what information was known to Delaney and Lauritzen at the time VanNorman's testimony was presented to the grand jury; thus, the Court cannot determine as a matter of law whether the County's actions were malicious or merely negligent, or whether they were done for the purpose of denying Plaintiff his constitutional rights under the Fourth, Fifth, Sixth, or Fourteenth Amendments to the Constitution. *Awabdy*, 368 F.3d at 1069. These determinations, along with the determination of whether there was probable cause to support the indictment, are more properly left for the jury. The Court will deny the County's Motion for Summary Judgment as to Count Two.

As to the conspiracy claim, the County asserts that Plaintiff has no evidence to support any "specific agreement or a meeting of the minds to violate [his] constitutional rights and acts in furtherance of that agreement." (Doc. 123 at 17 (citing *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010)).

Plaintiff does not claim to have evidence of a "formal agreement" between Defendants to deprive Plaintiff of his Constitutional rights, but he asserts that "there was certainly an implied [] agreement." (Doc. 133 at 14.) In essence, Plaintiff argues that Delany (*i.e.*, the County) and VanNorman (*i.e.*, the City) both knew that the evidence

presented was at best incomplete and at worst completely false, and yet they together presented that evidence to the grand jury in order to secure an indictment. (Doc. 133 at 14.)

Delany's testimony that she had worked with VanNorman many times, that she did not review many of the documents relating to case before presenting it to the grand jury, and that she generally had a practice of relying upon the information officers gave her at the issuing interview (Doc. 135-1 at 6, 8), along with VanNorman's testimony that he communicated the gaps in the evidence against Plaintiff to Delany and Lauritzen (Doc. 134-4 at 9-11) and the fact that he provided incomplete or even misleading testimony to the grand jury (Doc. 134-4 at 15-24), are sufficient to create a triable issue of fact as to the conspiracy claim. As such, the Court cannot resolve the conspiracy claim as a matter of law, and must leave these issues to the jury. Therefore, the Court will deny the County's Motion for Summary Judgment as to Count Three.

**VI.     The City's Motion for Summary Judgment**

The City argues that "Plaintiff cannot establish an unconstitutional City policy[,]" and that to "[d]eny[] summary judgment here would effectively eviscerate *Monell*." (Doc. 125 at 2.) In addition, The City joins in the County's Motion for Summary Judgment, addressed *supra*, and incorporates all of the facts and arguments therein by reference. (Doc. 125 at 2.)

Plaintiff opposes the motion, arguing that City employees knew of exculpatory evidence, including the falsity of Plaintiff's confession, but failed to present that information to the grand jury. (Doc. 132 at 3.) Further, the grand jury returned an indictment ultimately resulting in Plaintiff's imprisonment for over a year. (Doc. 132 at 3-4.)

### A.     *Monell* Final Policymaker Liability

The City argues that "as a matter of state and municipal law, TPD and its detectives and officers do not have final policymaking authority for the City." (Doc. 125 at 12.) Citing the Tucson City Code, the City asserts that police officers cannot be final

policymakers because the "the chief of police has full legal control over the police force, and the powers of individual off[ic]ers are limited solely to those set forth under state law and city ordinance." (Doc. 125 at 13.) In a discussion of *Davis v. City of Ellensburg*, 869 F.2d 1230 (9th Cir. 1989), the City explains that when there is no express policy, finding that "rank and file officers have final policymaking authority would create a 'giant loophole'" to *Monell*'s limits on municipal liability, and that such a loophole has been rejected by the Ninth Circuit. (Doc. 125 at 13.)

Plaintiff argues to the contrary, citing *Pembaur* for the proposition that "a single breach of a constitutionally protected right by a municipal employee could sufficiently constitute an actionable 'governmental policy'." (Doc. 132 at 4-5 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).) Plaintiff additionally points to city ordinances to show that although the city manager has the power to appoint a chief of police, the city manager does not exercise any control over police practices, all of which are under the chief of police's control. (Doc. 132 at 6 (quoting the Tucson, AZ City Code of Ordinances).) To make this point, Plaintiff asserts the negative in stating that "[t]here is no aspect of the charter or statute which awards the city manager any authority over the investigatory, detention, arrest, or prosecutorial decisions of the TPD." (Doc. 132 at 6.)

Unlike deputy county attorneys, discussed *supra*, TPD officers are not final policymakers able to subject the City to municipal liability. Detective VanNorman provided specific testimony that the decision of whether to take a case to issuing is preliminarily taken as an investigative team, but ultimately is left to his supervisor, Sergeant Jimenez. (Doc. 134-4 at 33.) He also testified that, on occasion, his supervisors are required to consult the Mayor and/or City Council before presenting a case to the grand jury. (Doc. 134-4 at 33.) This testimony directly contradicts Plaintiff's unsupported assertion that "[i]n the present case, literally every TPD investigator acknowledged that they have the final decision-making authority to effectuate an arrest, and/or present a case" to a grand jury. (Doc. 132 at 6.) And although Detective VanNorman's deposition testimony suggests that he may have presented incomplete or misleading testimony to the

grand jury (Doc. 134-4 at 15-24), there is no evidence that this is a practice or custom of the City, or that Detective VanNorman had policymaking authority for the City. The Court will grant the City's summary judgment motion as to the *Monell* final policymaker theory of liability.

### B. *Monell* **Affirmative Policy Claims**

The City argues that all three of Plaintiff's policy claims are "legally invalid[.]" More specifically, the City asserts that Plaintiff has not provided sufficient evidence for a rational trier of fact to "infer that a City policy or custom was the 'moving force' behind the alleged unconstitutional acts of the Defendant police officers." (Doc. 125 at 6 (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).) As to each alleged policy, the Court will address first whether there is sufficient evidence of the policy that it amounts to a "long-standing practice or custom" thus subjecting the City to *Monell* liability. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). Second, the Court will determine if there is a triable issue of fact regarding whether the policy is unconstitutional.[1]

Plaintiff appears to rely primarily on *In re Andre M.*, 88 P.3d 552 (Ariz. 2004) (en banc), to support his claim that the alleged policies were violative of his constitutional rights. (*See* Doc. 132 at 8-9.) *Andre M.* addressed "the standard for determining the voluntariness of a juvenile's confession when a parent has been denied access to her child's interrogation." 88 P.3d at 553. The Arizona Supreme Court determined that a parent's presence is only one factor to be considered in evaluating the voluntariness of a confession; in particular, "conduct by law enforcement personnel that frustrates a parent's attempt to confer with his or her child, prior to or during questioning, [is] a particularly significant factor[.]" *Id.* at 555. This is because parents can help ensure that a child is not coerced or deceived, and because a parent's presence increases the chances that a juvenile will understand the nature of the rights abandoned by confessing. *Id.* In determining that Andre M.'s confession was not voluntary, the court considered that, even though Andre

---

[1] The City does not raise any issues regarding whether the alleged policies, if unconstitutional, were the cause of Plaintiff's injuries.

M. "appeared to be of normal intelligence[,]"was interrogated in the relatively less coercive environs of his school as compared to a police station, and was interviewed for a relatively short time, he was only sixteen and one-half years old and was not given "age-appropriate" *Miranda* warnings, nor did he sign an acknowledgment of receipt or comprehension of the warnings that were given. *Id.* at 556.

Plaintiff alleges the existence of three affirmative policies: (1) a policy that denies parents notice or the opportunity to be present at their child's interrogation unless the juvenile specifically requests his parents' presence, (2) a policy to not investigate a juvenile suspect's mental capacity, I.Q., or cognitive disabilities, unless such a disability is obvious, and (3) a policy that prevented juvenile suspects from calling their parents when subject to interrogation. As to each policy, the City argues that there is legally insufficient evidence to show the existence of such policies and that, in any event, such policies would not be unconstitutional. (Doc. 125 at 7-8.) As to the third policy, the City additionally argues that there is no evidence that Plaintiff was even subjected to such a policy. (Doc. 125 at 8.)

There are issues of fact raised in the record as to the existence of each alleged policy. VanNorman's deposition testimony that he received training regarding how to address parental presence at interrogations of juveniles, which "depends on [the juvenile's] status" (Doc. 134-4 at 33), raises an issue of fact as to whether the City had an unwritten policy regarding whether parents should be permitted to communicate with juvenile suspects, and what circumstances interrogators should consider in moving forward with juvenile interrogations.

Specifically with regard to a policy of investigating a mental disability, at a minimum, Plaintiff's explicit and volunteered statement that he is "retarded[,]" is in "special education," and has a "learning disability[,]" (Doc. 126-2 at 132-22), which was not followed by any inquiry into Plaintiff's ability to comprehend the significance of the rights he was giving up by consenting to interrogation, raises an issue of fact as to whether the City has a policy of ignoring indications that juvenile subjects of

interrogation are of lower than average intelligence.

There is also an issue of fact as to whether the City had a policy of preventing juvenile suspects from contacting their parents during an investigation and whether Plaintiff was subjected to such a policy. At his interrogation, Plaintiff asked to make a phone call (*see e.g.* Doc. 126-2 at 49) but was ultimately not given the opportunity to do so. Although he did not ask to call his mother specifically, it would be reasonable to infer that a fourteen-year-old boy of below average intelligence would call his mother or other parental figure had he been given the opportunity to make a phone call. Thus, Plaintiff's phone-call request raises an issue of fact as to the third alleged policy. Lastly, as to each policy, *Andre M.* strongly suggests that if such policies did exist, they could, at least as applied in certain circumstances, violate a juvenile's constitutional right against self-incrimination.

The Court will deny the City's summary judgment motion as to each of Plaintiff's affirmative policy claims.

### C. Failure-to-Train Liability

The City asserts that Plaintiff has no evidence that the City had any knowledge, actual or constructive, of any policies that were likely to cause constitutional violations, and thus a failure-to-train claim, which requires deliberate indifference, fails as a matter of law. (Doc. 125 at 13-14.) To that end, the City points out that "Plaintiff has failed to allege that even one other person has been constitutionally injured in a similar manner . . . ." (Doc. 125 at 14.) Plaintiff responds that the City's argument as to the failure-to-train allegation, which focuses primarily on Plaintiff's inability to raise an issue of fact as to deliberate indifference is a "red herring." (Doc. 132 at 15-16.) In support, he realleges facts specific to his own experience, none of which suggest "program-wide inadequacy in training[.]" *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007). The focus on deliberate indifference is no red herring; it is the standard governing imposition of liability in this case. The Court will grant summary judgment on the failure-to-train claim.

**IT IS HEREBY ORDERED** as follows:

    (1) Plaintiff's Motion to Strike (Doc. 144) is **granted in part**. The Clerk of Court is directed to **strike** Defendant City of Tucson's Objection re: Statement of Facts in Support of Plaintiff's Response (Doc. 142) from the docket.

    (2) Plaintiff's Motion to Strike (Doc. 145) is **granted in part**. The Clerk of Court is directed to **strike** Defendant Pima County's Objection re: Statement of Facts in Support of Plaintiff's Response (Doc. 139) from the docket.

    (3) Defendant Pima County's Motion for Summary Judgment (Doc. 123) is **denied**.

    (4) Defendant City of Tucson's Motion for Summary Judgment (Doc. 125) is **granted in part and denied in part** as follows:

        (a) **Granted** as to *Monell* final-policymaker liability.

        (b) **Denied** as to *Monell* affirmative-policy liability.

        (c) **Granted** as to the City's failure-to-train TPD detectives.

Dated this 31st day of July, 2019.


_____
Honorable Rosemary Márquez
United States District Judge